UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 08-CV-11403-LTS

_____
                                            )
FRANCO BRUNO,                               )
       Plaintiff,                           )
                                            )
v.                                          )
                                            )
TOWN OF FRAMINGHAM, JULIAN SUSO, in         )
his capacity as Town Manager of the Town of Framingham,)
EUGENE F. THAYER, in his capacity as Superintendent )
of Schools for the Town of Framingham,      )
GARY DOHERTY, in his capacity as Athletic Director )
for Framingham High School, as well as his individual )
capacity, MICHAEL WELCH, in his capacity as Principal )
of Framingham High School, as well as his individual )
capacity; ROBERT MERUSI, in his capacity as Director )
of the Department of Parks and Recreation for the Town of )
Framingham, as well as his individual capacity, )
       Defendants.                          )
_____)

**DEFENDANTS TOWN OF FRAMINGHAM, JULIAN SUSO, EUGENE F. THAYER, GARY DOHERTY, AND MICHAEL WELCH'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**Preliminary Statement**

Pursuant to Fed. R. Civ. P. 56, the Town of Framingham, Julian Suso, Eugene F. Thayer, Gary Doherty and Michael Welch (collectively the "School Officials"), submit this memorandum in support of their motion for summary judgment.[1] The ample record establishes that the School Officials are entitled to summary judgment because (i) Franco Bruno's First Amendment claim (Count One) is precluded by the Supreme Court's decision in *Garcetti v. Ceballos*, citation omitted; (ii) his Whistleblower claim (Count II) is precluded because as a

---

[1] Julian Suso is actually the Town Manager. For sake of ease, Mr. Suso is referred to as one of the "School Officials."

matter of law only Mr. Bruno's "employer" can be held liable under M.G.L. c.149, §185, and, because, far from taking any adverse action against Mr. Bruno, the School Officials actually implemented his suggestion about purchasing safer soccer goals as soon as he brought this concern to their attention; (iii) the Amended Complaint does not even allege any of the School Officials' acts were carried out by "threats, intimidation or coercion" as is required under the Massachusetts Civil Rights Act (Count III); and (iv) as an at-will employee, Mr. Bruno did not have a vested property right in the Girls' Varsity Soccer Coach position for purposes of maintaining a due process claim (Count IV).

## I. STATEMENT OF FACTS[2]

**(i)    The Parties**

Franco Bruno ("Bruno") resides in the Town of Framingham.  From the Spring, 2004 until December 1, 2007, when he resigned, Bruno served as the Varsity Girls' Soccer Coach at Framingham High School.  School Officials' Statement of Undisputed Facts ("SOF"), ¶1.

Julian Suso is the Town Manager of the Town of Framingham.  SOF, ¶4.[3]

Until July 1, 2009, Eugene Thayer was the Town's Superintendent of Schools.  Mr. Thayer was appointed by and reported to the 7-person School Committee of the Town of Framingham.  SOF, ¶5.

---

[2] The School Officials incorporate by reference their Rule 56.1 Statement of Undisputed Facts ("SOF").  The deposition testimony (Volume I) and documentary evidence (Volume II) cited by the School Officials in the SOF are contained in a two-volume Appendix filed herewith.

[3] Although named in the lawsuit, the Amended Complaint does not actually contain any allegations against Mr. Suso or the former Superintendent of Schools, Eugene Thayer.

Gary Doherty is the Athletic Director of Framingham High School, a position he has held since October, 2002. There are approximately 27 separate varsity sports teams at Framingham High School. Excluding the playoffs, the Girls' Varsity Soccer Team ordinarily plays a 16-game schedule. Needless to say, with 27 varsity sports teams alone, it is incumbent upon Mr. Doherty and his staff to establish uniform policies for scheduling, transportation, purchase of equipment and the like: these decisions are not entrusted to 27 individual coaches. SOF, ¶¶ 6, 12 & 13.

Michael Welch is the Principal of Framingham High School. SOF, ¶7.

Robert "Bob" Merusi is the Director of the Department of Parks and Recreation for the Town of Framingham. The Parks and Recreation Department is responsible for operating the Town's many playing fields. The Town's playing fields are used by a host of teams, including, but not limited to, those from Framingham High School. Mr. Merusi reports directly to the 5-member Board of the Parks & Recreation Commission. The individual Board members of the Parks and Recreation Commission are appointed by the Board of Selectmen. SOF, ¶¶ 8 & 9.

**(ii)** **The Plaintiff's Tenure as the Girls' Varsity Soccer Coach.**

In the Spring, 2004, Gary Doherty hired Franco Bruno to coach the Girls' Varsity Soccer Team at Framingham High School starting with the Fall, 2004 season. Their agreement was oral: Bruno does not have a written contract with the School Department. SOF, ¶¶ 10 & 11. By that time, Bruno had been coaching soccer for over 20 years. Mr. Bruno maintains that, "through his extensive soccer coaching experience, Bruno has [become] aware of serious safety issues surrounding the transportation of soccer goals by children." SOF, ¶14. For whatever reason, in his first two seasons as the Girls' Varsity Soccer Coach, Bruno *never raised* the safety issue of having the girls' or boys' soccer teams physically carrying soccer goals on-and-off

-3-

playing fields with Eugene Thayer, Mike Welch, Gary Doherty, or any other School Official. SOF, ¶16.

On October 4, 2006, Chris Brown, an employee of the Framingham Parks and Recreation Department, approached the Boys' Varsity Soccer Coach to remind him that after practice, the soccer goals had to be moved and locked up. This conversation passed without incident. Mr. Brown then approached Bruno with the same reminder, to wit, the soccer goals needed to be moved off the field when practice was over. By all accounts, Bruno "lost it." Mr. Bruno verbally assaulted Chris Brown and told him in no uncertain terms, that "his girls" were not going to move the soccer goals. Chris Brown reported this incident to his boss, Bob Merusi. SOF, ¶15.

Shortly after this incident, Bruno met with Mike Welch and Gary Doherty to provide his (Bruno's) account of the incident with Chris Brown. At this meeting, Bruno raised for the first time with Mike Welch, Bruno's concern about having girls physically carrying soccer goals on- and-off the practice fields. In response, Mike Welch told Gary Doherty to make sure that no girls' teams were carrying soccer goals at any time. In addition, Mike Welch told Gary Doherty to replace any of the soccer goals that did not have wheels with soccer goals that did have wheels. As a result, by the start of the Fall 2007 soccer season, the Girls' Varsity Soccer team was not using any soccer goals without wheels. SOF, ¶¶ 17-18. At this same meeting, Mike Welch told Bruno that if he had any issues or concerns with policies outside of the School Department, that he (Bruno) was to *first speak* to Mike Welch or Gary Doherty. *Id.* As far as Mike Welch and Gary Doherty were concerned, the Bruno/Brown incident essentially was over.

**(iii)    Parks and Recreation Commission Issues A No Trespass Order.**

On May 12, 2007, in spite of Mike Welch's admonition at their meeting in October, 2006, Bruno approached Bob Merusi directly during an event at Victory Field and asked to speak to him about scheduling more girls soccer games at Bowditch Field. Bob Merusi quite properly declined to speak to Bruno about this matter and told Bruno that any such request should go through proper administrative channels, to wit, the Athletic Director, Gary Doherty. SOF, ¶22. A few weeks later, on June 6, 2007, the Parks and Recreation Commission voted to issue a No Trespass order that banned Bruno from the Bowditch Field Complex during any planned girls' soccer game. SOF, ¶24. On August 20, 2007, Ms. Rastani sent Bruno a letter informing him of the Commission's decision to issue a No Trespass order banning him form the Bowditch Field Complex for any planned girls' soccer events. SOF, ¶28.

After Bruno received the letter from Ms. Rastani and with the Fall, 2007 soccer season quickly approaching, Bruno went to speak to Gary Doherty and told him, in words or effect, "I just want this matter over with." Mr. Doherty agreed to speak to Bob Merusi on Bruno's behalf. After speaking with Bob Merusi – *with Bruno's knowledge and consent* – Mr. Doherty sent a letter to Ms. Rastani on September 10, 2007, indicating that a number of actions would be taken and that Mr. Bruno would be receiving a one-game suspension at the start of the Fall 2007 soccer season. Mr. Doherty told Bruno yet, again, that if Bruno had any policy issues with other Departments, then Bruno should first speak to him (Doherty) or Mike Welch. SOF, ¶¶29-30. On September 17, 2007, Ms. Rastani sent a letter to Bruno informing him that the No Trespass order had been lifted based on Mr. Doherty's letter of September 10, 2007. Mr. Bruno coached the girls' team for the remainder of the Fall, 2007 season without incident. SOF, ¶¶32-33.

### (iv)  Mr. Bruno's Four-Game Suspension and Resignation as the Varsity Girls' Soccer Coach.

In the Fall 2007, Bruno approached Gary Doherty about Bruno's appearing on Fox 25 news to do a story about soccer goal safety. Gary Doherty referred Bruno to Mike Welch. Although he initially opposed the idea, Mike Welch relented and told Bruno he could go ahead with the story. However, Mike Welch specifically told Bruno to leave his differences with Bob Merusi and/or Parks and Recreation out of it, and Bruno agreed to do so. <u>To show support for Bruno's concern about the soccer goal safety issue, Mike Welch directed AD Doherty to accompany Bruno and appear on the Fox 25 story, which he did</u>. The Fox 25 story aired on November 13, 2007; it did not contain any reference to Bob Merusi or the Parks and Recreation Department. SOF, ¶¶ 34-35.[4]

The day after the Fox 25 piece aired, Bruno came to Gary Doherty and said, in words or effect, "I just got myself fired." Gary Doherty relayed this comment to Mike Welch; Mike Welch then called Bruno and asked to speak with him. In their ensuing discussion, Bruno told Mike Welch that he had given an interview to the MetroWest Daily News which ran on November 14, 2007, in which Bruno "told them everything" including Bruno's differences with Bob Merusi over the lack of playing time afforded the Girls' Varsity Soccer team at Bowditch Field. Mike Welch asked Bruno if he remembered the conversation they had only two weeks before, in which Bruno agreed not to speak to the press about matters outside the Athletic Department without first coming to him (Welch) or Gary Doherty. Bruno said, "yes."
SOF, ¶¶ 40-42.

---

[4] An electronic copy of the Fox 25 story is provided in Volume II, Exhibit D.

On November 30, 2007, after consulting with the School Department's outside counsel and Supt. Eugene Thayer, Mike Welch sent Bruno a letter advising Bruno that he was suspended for the first four games of the 2008 girls' soccer season. Among other things, Mike Welch's letter stated that he wanted Bruno to remain the Varsity Girls' Soccer Coach and stated further that Bruno should respond in writing by December 5, 2007, if that was his intention. SOF, ¶43. The next day, Bruno wrote Mike Welch a letter resigning his position as the Girls' Varsity Soccer Coach. In Bruno's letter, he stated "I had hoped all along for more support and serious discussion of my concerns regarding soccer safety from within the School Department. <u>I am grateful however that in the end, the safety issue was resolved</u>." Mr. Bruno also noted that the girls' soccer banquet was scheduled for the coming Saturday "and I would prefer to keep this between us until after the banquet." Mike Welch and Gary Doherty honored Bruno's request. SOF, ¶¶ 45-46. A few weeks later, Bruno sent Mike Welch an e-mail in which he asked if he could withdraw his resignation; however, by that time Superintendent Thayer had already accepted his resignation effective December 1, 2007. SOF, ¶ 49.

On December 17, 2007, the School Department posted electronically the position of Girls' Varsity Soccer Coach position. Mike Welch directed Gary Doherty to convene a panel of teachers, parents and students to conduct interviews for the Girls' Varsity Soccer Coach position, which Mr. Doherty did. In January, 2008, the Panel interviewed two candidates – Franco Bruno and the Girls' Varsity Lacrosse Coach/Phys. Ed teacher, Stacey Freda. The Panel asked each candidate the identical questions and each candidate was given the same amount of time for his/her interview. At the conclusion of the interviews, the Panel recommended that Stacey Freda be hired; Gary Doherty did not vote. Gary Doherty took the Panel's recommendation to Mike Welch who, in turn, presented it to the School Committee. On or about January 30, 2008, Mike

Welch hired Ms. Freda as the Girls' Varsity Soccer Coach, which she remains today. SOF, ¶¶50-52. While no doubt disappointed, Mr. Bruno has not alleged that the Panel was biased against him and/or that the process employed by the School Department to hire a new soccer coach – following his resignation – was somehow flawed.

## II. ARGUMENT

### A. Mr. Bruno's First Amendment Claim Is Barred By The Supreme Court's Decision in *Garcetti v. Ceballos*.[5]

In an attempt to cure a fundamental flaw in his original Complaint, Mr. Bruno now contends that he "was speaking as a citizen about a matter of public concern – the life and safety of high school athletes – when he was punished for his speech." Amend. Comp., ¶47. The claim that Mr. Bruno "was speaking as a citizen" is belied not only by other allegations in the Amended Complaint, but also by the very news story which led to his 4-game suspension. Mr. Bruno maintains that, "through his extensive soccer coaching experience, Plaintiff has been aware of serious safety issues surrounding the transportation of soccer goals by children." Amend. Comp., ¶15; Deposition of Franco Bruno, pp. 8-9. Mr. Bruno's confrontation with Chris Brown and every other facet of Bruno's allegations all stem from the fact that he was the Framingham High School Girls' Varsity Soccer Coach. Amend. Comp., ¶¶ 20-39. For example, the No Trespass order issued by the Parks and Recreation Department directed Bruno to remain away from Bowditch Field "during any planned girls' soccer game." *Id.*, ¶25. In the Fall, 2007, Bruno approached Gary Doherty about doing a piece on soccer goal safety on Fox 25. Mr. Doherty thought it was a "good idea" and referred Bruno to Mike Welch. Although initially

---

[5] The School Officials omit any discussion of the standard review on summary judgment given this Court's familiarity with that review. *See, e.g., Holmes Group, Inc. v. Federal Ins. Co.,* 2005 WL 4134556*5 (D.Mass. 2005).

hesitant, Mike Welch said "Ok, just keep Park & Rec out of it," and Bruno agreed. Deposition of Franco Bruno, pp. 91-96. Simply put, to argue that Bruno spoke to the media about the soccer goal safety issue in any capacity *other than* as a soccer coach, is to resupinate reality.

Based on these facts, it is inarguable that Mr. Bruno's First Amendment based claim is barred by the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) ("*Garcetti*"). In *Garcetti*, the Supreme Court held where, as here, a speaker is speaking in his capacity as a public employee versus some other capacity such as a parent, taxpayer, or private citizen, and he is then disciplined by the public employer, the employee-speaker cannot maintain a Section 1983 action based on those statements. The Court observed:

> When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline . . . [e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government . . . When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees. 547 U.S. at 421-422.

The inquiry into whether a public employee spoke as a citizen or pursuant to his or her job duties is "a practical one." *Id.* at 424. Here, there is no question that Mr. Bruno went to the press about his concerns with students carrying soccer goals in his capacity as the Girls' Varsity Soccer Coach, just as, a year earlier, he brought these same concerns to Mike Welch and Gary Doherty. Mr. Bruno learned of this hazard "through his extensive soccer coaching experience," Amend. Comp., ¶15, and his credibility draws from his years of coaching soccer, not because he is a "citizen" of Framingham. Moreover, at the start of each season the Athletic Director, Gary Doherty, advises all of the High School's coaches to come to him if they have any concerns with the nature or use of the equipment in their particular sports. Affidavit of Gary Doherty, ¶3.

The MetroWest Daily News article in question shows Mr. Bruno in his coaching attire; standing inside a soccer goal; at one of the girls' soccer team's practice facilities; and, identifies him both in the Headline and throughout the article as the "Framingham High School girls' soccer coach."  Volume II, Exhibit E.  There is simply no evidence to support the notion that Bruno's comments to the press were made in his capacity as an ordinary citizen.  Accordingly, under *Garcetti* his First-Amendment based Section 1983 action should be dismissed.  *See, e.g.*, *Richards v. City of Lowell,* 472 F. Supp. 2d 51, 78-81 (D. Mass. 2007) (statements made by plaintiff-fiscal manager for workforce investment board, concerning alleged misuse of funds by his employer - the workforce investment board – not protected speech under the Supreme Court's decision in *Garcetti*).[6]

The School Officials pause to make one other argument with respect to Bruno's First Amendment claim.  Mr. Bruno contends that, "The value of the public concern about the safety of high school student athletes outweighs the interest of the Defendants in regulating speech to maintain internal harmony."  Amend. Comp., ¶48.  Perhaps, in the abstract, this is true.  Of course, notwithstanding that Bruno was aware that the boys' soccer teams routinely carried soccer goals on and off the playing fields, it was not until "his girls" were reminded to do so that Bruno brought this safety concern to Mike Welch's attention – over two years *after* he was hired as the Girls' Varsity Soccer Coach.  Perhaps more significant, Mr. Bruno concedes that he was suspended for four games "for discussing the soccer goal safety issue without *first* going through Mr. Doherty or Mr. Welch."  Amend. Comp., ¶39.  This is a critical point.  As Mr. Welch

---

[6]The School Officials are aware that unlike in *Garcetti*, Mr. Bruno actually made his statements directly to the media.  The School Officials submit, however, that this fact alone is not outcome determinative of the public employee/private citizen issue.  *See, e.g., Hogan v. Township of Haddon*, 2006 WL 3490353 (D.N.J. 2006).

testified, he never told Bruno that he could not talk to the press about soccer goals or any thing else. SOF, ¶37. Instead, both Mike Welch and Gary Doherty repeatedly told Bruno that if he had an issue or concern with a School policy or the policy of another department, that he should *first* speak to one of them before taking his concern public. Moreover, when the three of them met in October, 2006, Bruno promised to do exactly that. SOF, ¶17. Mr. Bruno was not suspended for speaking about soccer goal safety; he was suspended for his conduct, *i.e.*, for breaking that promise. Framingham High School has 27 separate *varsity* teams alone. As Mike Welch testified, the Athletic Department simply could not function if 27 coaches attempted to set their own agenda with respect to equipment, scheduling, transportation or any of the other myriad issues Athletic Director Doherty has to deal with on a more global basis. SOF, ¶18. Hence, even assuming *arguendo* he was speaking as a citizen, Bruno cannot meet his burden of establishing that he was suspended *because* he spoke about soccer goal safety with the media. *See Curran v. Cousins*, 509 F.3d 36, 48 (1st Cir. 2007), *citing, Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir. 1998) (noting that "an employee who engages in unprotected conduct [cannot] escape discipline for that conduct by the mere fact that it was related to protected speech."); *Taylor v. Town of Freetown*, 479 F.Supp.2d 227, 238 (D. Mass. 2007) (plaintiff must show his protected activity was "a substantial or motivating factor in the adverse employment action."). For all of these reasons, the School Officials are entitled to summary judgment on Bruno's First Amendment claim.

**B.      Mr. Bruno's Whistleblower Claim is Barred Because the Individual School Officials Are Not His "Employer" Under M.G.L. c. 149, §185 and Because the School Officials Actually *Supported* His Concern About Soccer Goal Safety.**

Mr. Bruno contends that the School Officials, acting in their official capacity, violated M.G.L. c. 149, §185, the Massachusetts Whistleblower Act (the "Act"). The Whistleblower Act precludes a public employer – including a municipality – from retaliating against an employee who engages in protected conduct as defined under the Act. G.L. c. 149, §185(f). Fundamentally, Bruno's claim against the School Officials individually cannot proceed because the Act only permits a claim against one's employer, not against a person individually. *See Bennett v. City of Holyoke*, 230 F.Supp. 2d 207 (D. Mass. 2002); *Fischer v. Commonwealth*, 2001 Mass. Super. LEXIS 414 (2001).

Mr. Bruno first took the issue of soccer goal safety to Messrs. Welch and Doherty in the Fall, 2006. Mr. Bruno conceded at his deposition that once he brought the soccer goal safety issue to Messrs. Welch and Doherty – far from taking any retaliatory action – they actually agreed to and, in fact, did purchase new soccer goals with wheels on them. Deposition of Franco Bruno, pp. 88-89. In essence, Mike Welch and Gary Doherty actually did "clean up [their] own house" before the matter became public. *Dirrane v. Brookline Police Depart.,* 315 F.3d 65, 73 (1st cir. 2002). As mentioned above, Mr. Bruno's four-game suspension resulted from his failure to abide by his promise to Messrs. Welch and Doherty with respect to taking his own "policy" concerns public. Mr. Bruno's insubordination is not protected activity under the Whistleblower Act. *See Fuentes v. Hampden County Sheriff's Dept.*, 2004 WL 1490434, *5 (D. Mass. 2004). For all of these reasons, the School Officials should be awarded summary judgment on Count II.

**C.    Mr. Bruno's Claim Under the Massachusetts Civil Rights Act Fails as a Matter of Law.**

Turning now to Mr. Bruno's claim under the MCRA, the School Officials need not tarry. The MCRA provides a remedy to a person whose rights under the U.S. or Massachusetts Constitutions or laws of the United States or the Commonwealth have been interfered with by "threats, intimidation, or coercion." *Flecher v. Tech. Comm. Corp.*, 410 Mass. 805, 818 (1991). Should this Court dismiss Bruno's First Amendment claim, then Bruno has no constitutional "right" upon which he can maintain a MCRA claim. While Mr. Bruno also alludes to the Due Process clause, as explained in Point IV below, he has no vested property interest for purposes of maintaining such a claim. Hence, Mr. Bruno has no federal or state constitutional "right" upon which he can maintain a MCRA claim, and Mr. Bruno does not even allege that the School Officials violated a "law" of the United States or Commonwealth. Accordingly, because MCRA – like Section 1983 – protects one's constitutional "rights," but does not provide a remedy for every violation of "law," *see, e.g., Commonwealth v. Perkins*, 52 Mass. App. Ct. 175, 181-82 (2001), the School Officials should be awarded summary judgment on Count III.

In addition, the Amended Complaint does not even allege that any of the School Officials' acts were undertaken through "threats, intimidation, or coercion" as is required to maintain an action under the MCRA. *See, e.g., Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994). Even if this Court were to assume that Mr. Bruno's four-game suspension resulted in a constitutional deprivation of some kind – which the School Officials submit would be an extraordinary result – that action would constitute a direct deprivation rather than "threats, intimidation or coercion." The MCRA was not intended to address a "direct deprivation of a plaintiff's secured rights." *Freeman v. Planning Bd. of West*

*Boylston*, 419 Mass. 548, 565 (1995). For all of these reasons, the School Officials are entitled to summary judgment on Mr. Bruno's MCRA claim.[7]

### D. Mr. Bruno's Due Process Claim is Barred by Well-Established First Cicuit Precedent.

To begin with, the First Circuit has held that where, as here, plaintiff relies on another specific constitutional provision, he cannot maintain a separate due process claim. *Pagan v. Calderone*, 448 F.3d 16, 33-34 & n.7 (1st Cir. 2006). Turning to the merits of Mr. Bruno's due process claim, it fails because he has no vested property right protected under the Fourteenth Amendment and because any injury to his reputation cannot support a substantive due process claim.[8] In order for Bruno to have a constitutionally-protected interest in continued employment with the Town of Framingham, he must first establish a legitimate property right in it. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). To have a recognizable property interest in a benefit, "he must . . . have a legitimate claim of *entitlement to it.*" *Roth*, 408 U.S. at 569-70; *Costello v. School Comm. of Chelsea*, 27 Mass. App. Ct. 822, 827 (1989). "Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules . . . that stem from an independent source such as state law . . . .." *Cleveland Bd. of*

---

[7]In addition, any claims against the School Officials in their official capacity are barred by principles of sovereign immunity. *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 593 (2001)(no claims against public officials under the MCRA for actions taken in their official capacities).

[8]The School Officials were not involved in issuing the No Trespass order. Hence, the School Officials' due process argument is confined to the four-game suspension meted out by Mike Welch after he conferred with the Superintendent and School Department's outside counsel. The School Officials note that Mr. Bruno's four-game suspension (from a 16-game season) did not, as a matter of law, constitute a "constructive discharge" as Bruno contends. *See, e.g., Greenberg v. Union Camp Corp.,* 48 F.3d 22, 26-27 (1st Cir. 1995); *Mahoney v. Driscoll*, 727 F.Supp. 50 (D. Mass. 1989).

*Education v. Loudermill*, 470 U.S. 532, 538 (1985). Here, Mr. Bruno had nothing more than an oral contract to serve as the Girls' Varsity Soccer Coach for one year. Mr. Bruno did not have his own, personal contract with the School Department.[9] Accordingly, as a matter of law he did not possess a legitimate claim of "entitlement" to this position. *See Waters v. Churchill*, 511 U.S. 661, 679 (1994) (plurality opinion) ("at-will government employee generally has no claim based on the Constitution at all"); *Russell v. Hodges*, 470 F.2d 212 (2d Cir. 1972) (Friendly, J.) (plaintiffs, including a "permanent" appointee, had no property interest for purposes of maintaining their due process action); *Brayton v. Monson Public Schools,* 950 F.Supp. 33, 39 (D.Mass. 1997) ("it is doubtful that plaintiff possessed any constitutionally protected right in his position as an extra-curricular soccer coach"); *Downing v. City of Lowell*, 50 Mass. App. Ct. 779 (2001) (School principal, subject to annual reappointment, did not have a constitutionally protected property interest in his employment); *Rafferty v. Comm. of Public Welfare*, 20 Mass. App. Ct. 718, 725 (1985) (at-will employee has no legitimate claim of entitlement to continued employment).[10, 11]

---

[9]Mr. Bruno is not challenging the process by which the School Department selected the new Girls' Varsity Soccer Coach, Stacey Freda, nor is he seeking reinstatement to this position. It is worth noting, nonetheless, that Bruno's selection as Coach of the Year, standing alone, is hardly sufficient to cast doubt on the selection of Ms. Freda by the independent panel that was convened for this purpose. *See*, *e.g.*, *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 537 (1st Cir. 1996).

[10]Mr. Bruno's alleged injury to reputation is also insufficient to maintain a Fourteenth Amendment action. *Paul v. Davis*, 424 U.S. 693, 700-701 (1976); moreover, he has not even alleged that he was entitled to, but denied, a name-clearing hearing within the Appeals Court decision in *Fontana v. Comm'r of the Metro District Comm.*, 34 Mass. App. Ct. 63, 64-65 (1993).

[11]The School Officials do not perceive the Amended Complaint as containing a substantive due process component. Suffice to say, however, Mr. Bruno's allegations come nowhere near to alleging conduct that "shocks the conscience." *See, e.g., Burnham v. City of*

**E.      The School Officials Are Entitled to Qualified Immunity From Suit.**

Finally, even if this Court rejects all of these arguments, the School Officials are entitled to qualified immunity from suit. The doctrine of qualified immunity protects government officials who perform discretionary functions from suit and liability from monetary damages. *Anderson v. Creighton*, 483 U.S. 635 (1987).[12] As this Court has noted, "the qualified immunity standard is not a stringent test, and gives ample room for mistaken judgments by protecting all but the plainly incompetent and those who knowingly violate the law." *Alfreedi v. Bennett*, 517 F.Supp.2d 521, 539 (D.Mass. 2007) (internal citations omitted). This doctrine protects public officials when their conduct does not violate "clearly established statutory authority or constitutional rights." *Anderson,* 483 U.S. at 640. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* To overcome this defense, plaintiff must establish that a public official "acted either outside the scope of his respective office, or if within the scope, [he] acted in an arbitrary manner, grossly abusing the lawful powers of his office." *Scheuer v. Rhodes,* 416 U.S. 232, 235 (1974). In *Harlow v. Fitzgerald*, *supra*, the Supreme Court removed the subjective aspect, *i.e.*, the actor's state of mind, from its previous qualified immunity standard. 457 U.S. at 818-819. The "driving force" behind this reformulation of the doctrine was the Supreme Court's desire "that 'insubstantial claims' against government officials be resolved prior to discovery and on summary judgment if possible." *Harlow*, 457 U.S. at 818-819 (citations omitted). "Thus,

---

*Salem*, 101 F.Supp.2d 26, 37-40 (D. Mass. 2000).

[12]The School Officials are aware of the Supreme Court's recent decision in *Pearson v. Callahan*, 129 S. Ct. 808 (2009), but respectfully submit that the decision in *Pearson* does not alter the substantive review this Court should undertake in assessing their claim of qualified immunity.

although 'unreasonableness' is often a classic question for the finder of fact, in cases such as this the reasonableness of the official's actions should be treated as a question of law." *Clancy v. McCabe*, 441 Mass. 331, 323 (2004) *citing Hunter v. Bryant*, 502 U.S. 224, 228 (1991). The relevant inquiry then "is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information [he] possessed at the time of his allegedly unlawful conduct." *Fabus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 91 (1st Cir. 1994).

The School Officials will assume that it was clearly established here that after *Garcetti*, Mr. Bruno had a limited First Amendment right of speech on a matter of public concern, i.e. soccer goal safety. Nonetheless, the School Officials are entitled to qualified immunity so long as a reasonable official in their position could believe, *albeit mistakenly*, that their conduct did not violate Bruno's First Amendment rights. *Dirrane*, 315 F.3d at 69. Here, Mr. Welch did not suspend Bruno until *after* he sought the advice of counsel – a significant factor in the "totality of circumstances" that forms the qualified immunity matrix. *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004). Moreover, both Welch and Doherty had *repeatedly* told Bruno to *first* speak to them about any policy concerns he had with other Departments. Mr. Bruno abided by his promise to do so on the Fox 25 piece and he *admitted* that that story did not result in any disciplinary action. Conversely, Mr. Welch had every reason to believe that he had the right to discipline Mr. Bruno for Mr. Bruno's insubordination because such conduct, in most instances, is not protected speech. *Dirrane*, 315 F.3d at 71; *Bates v. McKay*, 321 F. Supp. 2d 173 (D. Mass. 2004) (Police Chief entitled to qualified immunity where letter of reprimand violated officer's free speech rights, but those rights were not clearly established at time Chief issued the reprimand).

## CONCLUSION

This case grew out of an argument between two adults over the transport of soccer goals. That it has grown into a federal case lends support to the notion that legal trees bear strange fruit. In any event, the School Officials submit that having pared down Bruno's claims, their Motion for Summary Judgment should be granted in its entirety together with such other relief as this Court deems just and proper.

Respectfully submitted,

The Defendants,
TOWN OF FRAMINGHAM, JULIAN SUSO, in his capacity as Town Manager of the Town of Framingham, EUGENE F. THAYER, in his capacity as Superintendent of Schools for the Town of Framingham GARY DOHERTY, in his capacity as Athletic Director for Framingham High School, as well as his individual capacity, MICHAEL WELCH, in his capacity as Principal of Framingham High School, as well as his individual capacity,
By their attorneys,
**PIERCE, DAVIS & PERRITANO, LLP**

/s/ Adam Simms

Adam Simms, BBO #632617
90 Canal Street
Boston, MA 02114
(617) 350-0950

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the EFC system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 30th day of July, 2009.

/s/ Adam Simms
Adam Simms